Mr. Chief Justice, may it please the court, we're here regarding a case, a horrific outcome involved an arrest and a stop in Fort Worth that resulted in the shooting death of Sherell Thomas. Now the facts that go to this, the district court granted a summary judgment as to qualified immunity. We would like to take a step and look at those instances that the court asked us to do at the moment the police officer discharged his weapon. We would say that under those circumstances at that time that the facts in this case show that at the moment that the police officer discharged his weapon and fired 12 rounds into the vehicle that he was not in fear of his life and that his actions were truly those that were unreasonable under the objective standard. Not only are they unreasonable, but the facts in this case show that they were inspired by violence and malice. It's important. It does, Your Honor. What set me up cases as we look at the substantive state of mind of the officer as opposed to the objective reasonable officer standard? Well, Your Honor, there's not one that necessarily says exactly those words, but what I do have is that the totality of the circumstances are to be looked at, and I understand that the Fifth Circuit has narrowed that very recently in opinions that narrow that to that moment where the police officer discharged his weapon. Even if we hadn't, it seems to me your argument comes down to you say that his life was in danger because of his own intervening actions of attempting not once but twice to grab a hold of a moving vehicle when Romer had a chance not to do so. That's basically your position, isn't it? Yes, Your Honor, it is. So what if Romer had stepped in front of a fleeing vehicle and said stop with his gun pointed? Is that putting his life at risk in that situation? Yes, Your Honor. He's clearly entitled to do that, isn't he? Well, Your Honor, whether he's entitled to do that, but does that become objectively reasonable or unreasonable under those circumstances for an officer to do that, and was it inspired by malice? We don't ask whether it's inspired by malice. I mean, it seems to me we've got lots of law saying in the U.S. Supreme Court that an officer may step in front of a fleeing vehicle with a weapon drawn in order for the vehicle to stop. Your Honor, if he chooses to do that, my argument is that the facts in these cases that show that his stepping on the side of this vehicle under those circumstances was not reasonable. And that his decision to do that under the circumstances that we have, where in this case, Sherell Thomas had been pulled over. They were stopped at this one spot for over ten minutes. He was being arrested on misdemeanor traffic warrants. Now, he had been a person admittedly under surveillance. The police officers hoped to find drugs in the vehicle. They could not get a canine dog to come out to smell the car. And, in fact, there were no drugs in the car. There were no weapons. But at the time and at the stop and in the affidavit testimony, even excluding the testimony of the three minor children that were in the vehicle and the other individual in the front seat, excluding that, just based upon the affidavit testimony of the officers, it's clear that there is no conclusiveness to the story that Officer Romer's arm was caught inside the vehicle and that he was dragged by the vehicle. We have to assume, we have to ignore what the officers say and take your side of the case at face value. So, we accept all of that. Yes, Your Honor. Ignore what the officers say. And I would even like to go and ask the court to look at the officers' testimony themselves. And imagine, if you will, they're at the vehicle. We're at the driver's side door. There's the A pillar and here's the B pillar. Now, Officer Romer, the officer that fires the shots, he's at the A pillar. Standing right next to him is Officer Drew, who's 6'4", and in his affidavit says, I could clearly see the actions of the driver and I saw him put the car in drive and step on the gas. What's important about his affidavit is he's standing right next to Officer Romer and doesn't say anything about seeing Officer Romer's arm caught inside of the window. He then comes back in his affidavit and says later after the fact that, oh, now I realize that that's what he was doing. But yet at the time, he's standing right next to Officer Romer and he contradicts Officer Romer's statement. My point is we will spot you that Romer's arm was not caught in the window. Yes, Your Honor. And under those circumstances, Your Honor, I think it's terribly important to get to the truth of what happened at this stop. And if the court concedes my argument, then there's no question that what Officer Romer did was unreasonable. If there is a vehicle stopped and the person needs to be arrested for outstanding misdemeanor traffic warrants, it is unreasonable to pull your weapon and fire your weapon 12 times into a vehicle that also includes three of his minor children and another passenger. That is clearly something that would be unreasonable. And to get to the truth of whether or not Officer Romer's actions were reasonable or unreasonable requires a view of the totality of the circumstances. And I'm simply asking the court to look at the facts, the circumstances that surrounded this stop, and to understand that what Officer Romer did, based upon the fact that this was an individual that they were simply arresting him for misdemeanor traffic warrants, to use lethal force under those circumstances, that that was, in these circumstances, something that was unreasonable. Of the best facts most favorable to you, how far had the car moved when the first shot was fired? It's very difficult to determine, but the evidence suggests that the car was in the parking lot, that there was a turn to the left, at which time, if viewed in our favor, that is when Officer Romer attempted to jump onto the vehicle. Then the car pulled onto the access road. And depending upon all the different statements, there is a video that actually shows the car leaving. And it appears that the car does accelerate, but not at the rate that it is said. The question is, how far did it go? Well, Your Honor, I'm trying to get to that, and it probably—I don't know. I'd have to—that's the honest answer, Judge. I don't know. That's the answer. If you want me to guess, 30 yards, 40 yards. No, no, that's fine. I just wanted to get to the answer. Yeah, 30 or 40 yards, Judge. All right, let me ask you a different question while you're still in the light. In May of this year, the Supreme Court decided Plumhoff, where the officer shot into the vehicle 15 times. So tell me what your thoughts are with respect to how that case affects our analysis in this case. Your Honor, in Plumhoff, that had involved a high-speed chase that lasted for a long period of time. In this case, this was not a long high-speed chase. Clearly, there was other criminal activity that posed a danger to the public. None of those factors existed on this occasion at that time. This was not a situation where there was a danger to the public at that time, and a better decision would have been to let him go. They knew where Sheryl Thomas lived. They knew he had children in the car. That's where I have trouble with your argument. You're saying that if it's just a misdemeanor traffic violation, an officer can't physically get in front of a vehicle and tell it to stop because that's putting himself at risk. Your Honor— You're saying that officers can't use force or some means of stopping that vehicle if it's just a traffic—just outstanding traffic warrants. To distinguish it. If the officer stands in front of a vehicle, I'm not saying that that in and of itself is unreasonable. Well, that puts himself in harm's way. But the point that I do think that is unreasonable is for an officer to run and jump on a moving vehicle with the intent to kill the driver at that point by firing in the vehicle. And I think that it's one— It gets back into subjective intent, which we cannot do. So he jumps on the vehicle. Did the vehicle continue to move with him on the side of it before shots were fired? Yes, he was on the vehicle, and it moved before shots were fired. So it was moving when shots were fired? Based upon the evidence that we see here, yes. Was it accelerating or slowing down? We don't know for sure. What does your evidence say? Well, my evidence was that the car was moving. But whether or not it was accelerating, I don't know for sure, Your Honor. How fast was it moving? As low as 20 miles an hour to as high as other evidence saying it was upwards toward 50. There is a wide range of— It was a camera at the convenience store, and it shows literally just the vehicle leaving the lot. But the video does not show any vehicle going 50 miles an hour, Your Honor. Do you dispute that Romer had jumped on the hood and was thrown off one time before he got back on a second time? No, Your Honor. I think that Romer— That is the testimony of one of my clients, is that he attempted not once but twice to get onto the vehicle. And the vehicle didn't stop even after he'd been thrown off of it? No, Your Honor, it did not. Was the answer to my question that the facts are different in the two cases? I'm not sure what you meant the answer to my question to be. If I can remember your question, Your Honor. My specific question was the Supreme Court decided to throw him off in May, and I asked you what effect that case had on our analysis. Your response to me was by telling me that the facts were different. In a nutshell, that's what you said. Temporally, it was different, et cetera, but you didn't give me an answer as to how, if at all, the analysis in the case . . . I mean, there are fifteen shots there to twelve here. I get that. Let me put it like this. Just stay with my question, and when you come back up on rebuttal, you can give me another shot. I just want to make sure I understand, not just this call was this, this call was that. I get it, that all the cases are different on some measure of facts. My question went to the core of the Supreme Court's analysis in the excessive force calculus. Do you follow me? Yes, Your Honor. All right. You've reserved time for rebuttal. When you come back up, just know that I haven't forgotten the question. Yes, Your Honor. All right. All right. Ms. Edmonds? Is that all right? I think Ms. Edmonds, you're up, right? May it please the Court, I'm Bobbi Edmonds, and I'm a co-counsel in the case for the minor children and the minor children in this case. And, Your Honor, along with my co-counsel, we say that this case is distinguishable from the other cases and that I don't want to be repetitious on what co-counsel has said, but it is very important that the cases have indicated that at the time of the shooting, it has determined that the officer's life is in fear. And our position is that the Court should, although those cases are looking at the time of the shooting, the officer's life in fear, that the Court should expand it to look at circumstances immediately up to the shooting, particularly in this case where there are minor children involved. And I know there are some cases to say that the driver's actions. I thought the test is whether it's reasonably necessary to protect the life of the officer or the public, other people. I think that's what those cases boil down to. At that time, was it reasonable for him to do that because he was protecting either himself or the public? Now, what difference would have made what happened before if at that particular time he is either trying to protect himself, his life, or trying to protect the public? Your Honor, it makes a difference if the officer's conduct was objectively reasonable in the circumstances because if the officer places, if the circumstances is not a circumstance where the officer's life is in danger and the officer takes action that is unreasonable at the time, in this case, the officer's off the vehicle, gets back on the vehicle, and we understand that the vehicle's still moving. There is an issue on whether or not it was accelerating because when he shot, whether that stalled the driver who had one leg and whether the car was declining in speed. We don't know that for sure. We just know it was still moving. And so Officer Warmer, in this case, falls off according to some of the testimony, Your Honor. We think a material fact that will preclude a summary judgment. He gets back on. The other officers don't. The other officers said he created his own danger. Your Honor, he could create the danger that leads to pulling a trigger. In this situation, there was not a circumstance that included pulling a trigger and shooting into a vehicle with three children and a passenger. And there were no explicit words. There were no threats before this guy took off in the vehicle. And we understand he probably should have stopped. But then when you jump back on the vehicle a second time, are you putting yourself in that situation? And then are your emotions arising so that you take unreasonable moves and pull that trigger and shoot in a moving vehicle with three children and then turn it in to say my life was in fear is the reason I shot at the moment. But the life was not in fear when he got on that vehicle, when that car was moving some and causing him to pull that gun. We're saying that conduct of this officer under these circumstances was not objectively reasonable. And that, Your Honor, there was a risk of danger, but it was to the people that were in there, not to the general public, but to the people that were occupants of that vehicle at that time. And so the officer chose to hang on to it, and the car moved. And there are the material facts that are at issue would preclude a summary judgment. We're saying there are material fact issues that this case should go back and let a trial or jury determine those with the officer's testimony, children's testimony with minor children, and the actions of the officer. And we're saying that. How about this guy who has a warrant for him that won't be arrested, that says you're not going to get me, that drives on with a guy with a pistol inside his thing? Where is he in being reasonable and his responsibility to the people in the car? Where is the outrage as to his behavior? Where is the outrage at this lawless guy that's putting all these people at danger, and instead all this outrage goes at the guy with the badge who's trying to arrest the guy that's got a warrant against him? Where is the outrage? Your Honor, we're not saying the deceased was a pillar of the community. He didn't move. He put all these people in danger. He did move forward. But, Your Honor, his actions were not actions that would cause that officer to pull the gun and start shooting, Your Honor. There were other outlets. The conduct of the officer was not objectively reasonable, and it was inspired by malice because he was angry at this man, this black guy that didn't listen. And, Your Honor, to teach everybody in that car, which were little black kids, and the passenger, that the police is in control. But, Your Honor, we're not saying that the deceased did not do wrong. You've got to let me finish. I'm just going to let you finish your thought. Yes, thank you, Your Honor. Thank you. All right. Now, Mr. East. Good morning. If I may please the Court. The only factual dispute that appellants have tried to point to relates to an irrelevant period of time, a time preceding the point where the officer was faced with a use of force decision. Plaintiffs' appellants make that argument because they have no argument regarding a dispute of fact. What happened before informed what happens at the present. If you take the cases recently from this Court or from the Supreme Court, when they talk about whether the officer was in fear for himself or trying to protect the public, they recite that the person was violating the law, that he was wanted for a felony, that he had driven in an erratic way,  that he had a pistol, that he had brandished a gun, that he had kidnapped someone and threatened someone. And all of these things that happened in the past, don't they inform the present state of mind in terms of whether that officer has a reason to believe that his life is in danger or that the public needs protection? Don't those things, they're not so vacuous or vacant that they don't inform the present, do they? I mean, my goodness, if the guy had a gun, you'd say they saw him three minutes ago with a gun aiming at the children. You'd be making that argument. Yes, Your Honor, and that is the context in which that sort of set-the-stage argument is typically made. At the end of a high-speed pursuit, officers confront a victim and they have the right to, an objective officer with the background and mind has the right to view that person as more dangerous than a typical person pulled over on the side of the road. That set-the-stage sort of background is relevant for a reasonable officer's view of the facts at the moment the use-of-force decision is made. You've got a judgment problem. Maybe you don't have a cause of action, but you've got a guy with a misdemeanor and you've got children in the back of the car and you've got a guy with a misdemeanor that says, I'm not going to stop, so you jump on there and start firing. There are some serious judgment problems. Serious. Well, Your Honor, two responses to that. You're correct. The record we're faced with is the one that the district court adopted, taking the plaintiff's version of the facts on their face, that my client voluntarily chose to jump on a speeding vehicle. The argument could almost be made under Matsushita or Scott v. Harris that the record taken as a whole couldn't allow any reasonable jury to believe that, but that's not the case. Even assuming he jumped on the vehicle, once he's down the road, the passenger, Cordell Davis, is yelling at the driver to stop. The passenger, Cordell Davis, eventually jumps out of the car and suffers severe injury. That's how fast the vehicle's moving. The officer's yelling, screaming for his life, telling the driver to stop. At that moment, we don't require officers to go back and reevaluate everything that occurred to decide whether or not they can defend themselves at that moment in time. At that moment in time, which this circuit, and recently in Plumhoff, the U.S. Supreme Court said, you look at the moment. There's no question that's the analysis, and at that moment in time, they have far from overcome their burden to show that no reasonable officer can believe that he was in fear of injury or death. Officer Cromer used extraordinary care under those circumstances in pulling his gun and managing to shoot at and strike only the driver of this vehicle. He fired a volley of shots. The vehicle kept accelerating. It didn't decelerate. He immediately reevaluated, paused, fired another volley of shots. The vehicle decelerated, went off the road. No force was used after that point in time. The circumstances are unfortunate, but as you observed and as the Supreme Court observed in Plumhoff, it was the driver who put the officer and others in danger. What kind of weapon has 12 rounds? I'm just curious. I don't know that it's in the record. I'm thinking it's a 6-hour, if my recollection serves me right, a .45-caliber 6-hour. It's 12 in the clip and one in the chamber. At the end, he noticed one bullet was left in the chamber. That's how he knew 12 was discharged. Not all hit the driver. The cases I cite regarding the number of shots, and again, the Supreme Court in Plumhoff talked about that. The only distinction between Plumhoff and the present case is that the Supreme Court said, you're entitled to stop the threat in Plumhoff. It was to the public. Here, it's to the officer himself. The cases I cite in my brief, including Elliott v. Levitt out of the Fourth Circuit, which courts around the country have relied on, talk about the number of shots is not determinative, and especially when you have a bullet left over. It speaks to stopping the threat, not to anything else. The state of mind is irrelevant. The cases are clear on that. Did you have an answer to Judge Owens' question about how long this car was moving with this officer on the... or the distance, I believe, was her question. In the sense that there are photographs in the record. There's a picture at page 194, which depicts an aerial view of the scene and the path the vehicles followed, and the photographs in that area of the record that show the evidence markings where the bullet casings were found, this shooting began about halfway down this close to two-city block path at the time when it was veering toward the on-ramp of the freeway. And that's what the officer testified, knowing that he's stuck on the side of this vehicle holding on for his life. Once they enter the freeway, his chances are greatly reduced. You know, there's a couple of other side issues that are much less important here. There were state law claims by one plaintiff's group left over in their amended complaint. I believe they were arguing intentional infliction of emotional distress. Those claims were dismissed for both official immunity reasons and under the state's Election of Remedy Doctrine 101.106, and the plaintiffs have not raised those issues. The official capacity claims were dismissed actually twice. The district court dismissed those claims in his consolidation order, I think might have overlooked that, and then did it again subsequent to the summary judgment. So those claims are gone and not on appeal. And to the extent that the appellants do try to get into Officer Romer's head, they make kind of extreme statements saying that his purpose was to go out there and kill the driver of this vehicle. The case law is clear. It's an objective standard. We don't, you know, Graham v. Conner said even an officer's evil intentions are not relevant. In Poole v. City of Shreveport, this court again looked at that and said, you know, even if he did have a desire to avenge a personal insult which led his use of force decision, that's not what we look at. We look at an objective person in that role. I think it's an unfortunate set of facts, but I think the law is clear on this appeal. If there are not any other questions, I will sit down. Thank you. What time of day was this? Sorry? What was the time of day? It was in the evening? It was dark. All the witnesses testify it was dark. It was about 30 minutes after sunset. And just to touch on the record, all of the plaintiffs testify the vehicle was going fast. It was dangerous. The officer was in danger when he was on the vehicle. Cordell Davis testified at page 386 of the record, traveling as much as 40 miles per hour. The minor CTT said fast and dangerous at 425. The minor TLT said it was fast. His arm was stuck. The car was going everywhere. He was trying to get away from the police. It was dangerous, all in the record at 445, 450. There's no dispute at the relevant moment in time where the facts are material,  Thank you, Your Honors. All right. Back to you, Mr. Combs. Your Honor, I believe the answer to your question with regard to the case in Plumhoff was that police officers are justified in firing at a suspect in order to end a severe threat to public safety, and they need not stop shooting until the threat has ended. And that would address the firing of the 12 rounds in this case. However, some of the facts addressed by the court I want to touch on here briefly. Your Honor, you asked how far had the car gone before the length of time from where the car left the convenience store and went down the access road was maybe about 200 yards at most, probably more along the lines of 150 yards. So this vehicle did not travel a mile or any distance. So it would have only had 150 yards to reach its top speed and then come to a rest. It never did enter the highway. There may have been a period of acceleration. However, reaching a high speed, 40, 50 miles an hour, would have been impossible if the entire stretch that the vehicle traveled... The car never got on the freeway? The car never was on a highway? It was on a frontage road, Your Honor. So it was on the road, it just didn't make the freeway? Well, it passed the access ramp, Your Honor. It did not enter the highway, though. It stayed on the frontage road, but it only went about 150 yards. So during this time, it was a very short period of time that all of these actions transpired. And ultimately, the point that I think is critical here is that the vehicle never did reach a huge rate of speed. Cordell Davis... So the officer had to wait till, what, how many miles prior before he was justified in shooting? Your Honor, in this situation, I think the officer should have jumped off that vehicle. Cordell Davis jumped out of that vehicle, and he really did not get severe injury. He was not admitted to the hospital. He was treated... You're saying police cannot pursue. That's your argument. No, Your Honor, it's not. Under these circumstances, it was unreasonable to do so. There was no gun in the car. There was no other threat to the public or to the people inside the vehicle. Now, if this had been a different situation, there was a gun displayed, there was a verbal threat of violence, A officer pulls somebody over. He has outstanding warrants. He says, Please get out of the car. We're going to put you under arrest. The car starts to drive away. Another officer stands in front and says, Stop the car. Can the officer do that? Place himself in front of a moving vehicle. Yes, Your Honor. So what's the difference? Well, the differences in this case is, first of all, the officer made the decision that he was going to stop that vehicle no matter what. Well, the officer steps in front of the vehicle. I'm going to stop it no matter what. But then if that officer then decides to pull out his weapon... The vehicle keeps coming. He pulls out his weapon and says, Stop. The vehicle keeps coming. Well, Your Honor, I find a distinction, a factual distinction in this case. And that's not what happened. And I know that there was a previous Fifth Circuit case where there was a situation. I think it was the Frayer case, I believe, that happened in Garland, Texas, where, yes, there was an officer that was in front of a vehicle. There was another passenger. But those circumstances were quite different. The chase had been going on for a long period of time. But we didn't have that here. We didn't have a situation where the driver said, There's an officer there, and I know that that officer may get hurt and I may run over him. That's not what happened. Well, why didn't the driver stop when the officer jumped on the side of the car? Your Honor, I don't have an explanation for that. But I think one distinct possibility is that the driver wasn't going anyplace. And I'm not excusing his action. Officers cannot now jump on the side of a moving vehicle. I think that, Your Honor, I think that was incredibly poor judgment and unreasonable on behalf of this officer to jump on the side of a moving vehicle. I do, Your Honor, under these circumstances, I think it was poor judgment. Counsel, I think that the dilemma that this court has, and lots of courts have it, is these situations are such that they're moving. They affect the heart. They affect the way you think about how people should behave on both sides. But the bottom line in terms of the lawsuit is whether there has been a constitutional violation. I think too often times in our society is we make a determination, this is not a constitutional violation, and that therefore people get the feeling, well, because it's not a constitutional violation, the courts are blessing it and they're saying that there's nothing wrong. You can have errors of judgment. You can have mistakes. You can have tragedies. These happen in life, and they're going to continue to happen. But does that tragedy amount to a constitutional violation? And so what we have in this case is not whether a tragedy occurred. We know a tragedy occurs. Not whether this should have happened or not should have happened. I think, frankly, there was a terrible mistake of judgment, of jumping on when somebody's got a misdemeanor and you don't see a gun and shooting. However, informed by what the case law is, as bad as that may look and feel and not feel right, I have a very strong question about whether that constitutes a constitutional violation. And so in our communities, we go back, the cases are over, and people say, well, the court said that nothing wrong happened. Well, wrong has happened. It just may not turn out to be a constitutional violation. And we have a great disconnect in our communities about understanding that principle. But I appreciate your and co-counsel's diligent and forceful representation of your clients. Thank you. Thank you, Your Honor. May I sum up with one sentence? Go ahead. I would ask the court that given the scope of the case law, that I think that there is room for this case to be sent back to the district court, for the evidence to be heard in front of a jury, and for the truth of these circumstances to be set forth in that we have the opportunity to find the truth of what happened here. But that's what's different about that. Every qualified immunity case we get, persons in your posture make the argument that's expected, that there are facts that need to be heard below and they're tried. I'm not minimizing what you're saying. It's just when we get to qualified immunity, that is the argument to get back. The point is, I mean, counsel's office says the facts that you and co-counsel are articulating as disputed facts are not the relevant facts for purposes of the equation that we have to look at. Not that there aren't some disputed facts, but that the facts, your articulation of dispute, is not in the target range of the core facts that we have to look at. So my question is, assuming that that's a fair assertion, just say to me, short, declarative, sentence-wise, what the relevant facts are that are in dispute as related to the calculus we have to look at, if you can do that. Yes, Your Honor. The fact that this officer made a decision to jump on a moving vehicle demonstrates that he was not in fear of his life. At the moment he pulled the trigger, at that one moment, the evidence shows that this officer was not in fear in his life. Instead, he was objectively, unreasonably acting in a way that he was going to stop this vehicle at all costs. All right, now having said that, my last question is, in this sea of case law, what is the best case you have that anchors the point you just made? Your Honor, I'm blanking out on the name of it. I think it may have been Hobart. That's not a good thing for the question I asked. Yes, Your Honor, I understand. I believe it was Hobart. It was the situation where the officer paused for a few moments before he pulled the trigger. When the threat had ceased, and it's cited in my brief, he pauses for a few seconds, and then he decides to pull the trigger, and the key is he had an opportunity to reflect on his decision on whether or not to pull the trigger, and that's what we have here. Our officer had a moment. He had a critical moment where he could have decided not to jump on that vehicle. All right. Go ahead. No, no, we got you. I'm done. He's answered my question. Go ahead. What is the evidence most favorable to you of how long it was from the time he jumped on the vehicle before the first shot was fired? I don't think there's any question. It's the distance that the vehicle traveled. So it was 150 yards? At most, Your Honor. So he was on the car, and there was time and effort for the car to go 150 yards before he pulled the trigger. He didn't jump on the car and immediately fire. That's correct.  before he pulled the trigger, but our argument would be it was long enough for him to jump on the vehicle, and he was right-handed, so he would have had to jump on the vehicle, pull out his pistol, and then fire. And the vehicle's only going 150 yards, so it all would have had to have been done without really any delay. It would have been a fluid course of events. He would have jumped on the vehicle, pulled the trigger because he had, at least in his testimony, it was in three different bursts. So he jumps on the vehicle, he fires four or five rounds, pauses for a second, fires another set of rounds, and then he has to fire another set of rounds. So you have 150 yards, and he has to fire 12 rounds, and the car's maybe going at a minimum of 20, 25 miles an hour to go 150 yards and fire 12 rounds. I'm sorry, Judge, but that's all the evidence we really have is that sequence of events there from the 150 yards from where he leaves the convenience store parking lot. I see your point. If he jumped on the side of the car and put the gun to the guy's head and pulled the trigger like boom, it's one thing. But if he's on the car and being carried along with it before he fires, then you get into a... I'm glad you brought that up. Your Honor, it is our point that he jumped on the vehicle and immediately fired. And the evidence supports that. Yes, Your Honor. There was no delay at all. He got on the side of the vehicle and immediately fired. The evidence from my client and the children as well as the police officer is that they don't necessarily specifically say in terms of time. Nobody says it immediately happened or anything like that. But there is clearly nobody says that there is a delay. Nobody says that there was a pause, a time for reflection. I thought the children said he grabbed for the steering wheel and there was some sort of struggle for the steering wheel. One of the children said that. One of the children in the affidavit said that there was a grabbing for the steering wheel. But the duration that that may have happened and the exact time that it happened, it may have been right there at the beginning and it would make sense that it would happen right there at the beginning when the vehicle is leaving the parking lot that there might have been an attempt to reach. But certainly in our evidence there is a time where after he jumps on the vehicle, Your Honor, I don't think there is any evidence that there was a delay between the time that he jumps on the vehicle and then the decision to fire the weapon because all of this has to take place in a very compressed period of time. And then it was because very quickly after that first couple of rounds went off, actually, after the first rounds went off, Cordell Davis jumps out of the vehicle. And he was roughly half the distance. So by the time Cordell Davis jumps out of the vehicle, if it had gone 150 yards, he would have gone 75 yards. And so he would have had to have fired the first four shots before the vehicle went 75 yards. That would have given him enough time to jump on the vehicle, get a hold of the luggage rack on the top, remove his weapon, and fire four shots. So it would have had to have been a constant, fluid, rather rushed sequence of events, Your Honor, for him to do that. I wish there was a video of this, Your Honor. We do have a video of the car leaving. That's it. Is his gun drawn then? You can't see him on the video, Your Honor. It's the way the car is situated. I can't see that side. You can't see that side. No, Your Honor. It sees the passenger side, and you see the vehicle leave. But you can't see. And you can see at the very, very top of the screen, you can see just the legs of a police officer chasing the vehicle. And which officer that is, it's impossible to tell. All right. Thank you, counsel. Thank all counsel for your briefing and argument in this case. Your responses have been helpful. The case will be submitted to the panel. Before we take up the third and fourth cases, the panel will stand in a short recess.